IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION

| Zekiya Knox, | C/A No. 0:17-cv-36-CMC |
|---|---|
| Plaintiff, | |
| v. | **Opinion and Order on Motion of Defendants Jeffrey Warden, MD & South Carolina Emergency Physicians, LLC to Exclude Expert Testimony and for Summary Judgment** |
| The United States of America; Amisub of SC, Inc., d/b/a Piedmont Medical Center; South Carolina Emergency Physicians, LLC; Jeffrey Warden, MD; Brian Fleet, PA; Piedmont General Surgery Associates, LLC; Alex Espinal, MD; Bret Garretson, MD; and Digestive Disease Associates, | |
| Defendants. | **(ECF No. 121)** |

Through this action, Zekiya Knox ("Plaintiff") seeks recovery for alleged medical malpractice by a variety of medical providers involved in her care from September 2013 through May 2014.[1] Plaintiff alleges these providers failed to properly and timely diagnose and treat her underlying condition, Crohn's disease, and that this failure led to the development of sepsis. Plaintiff further alleges various Defendants failed to properly treat her sepsis and that the collective errors led to Plaintiff's loss of three limbs. Plaintiff asserts a single claim for medical negligence

---

[1] Plaintiff alleges errors by each of the following Defendants: (1) her primary care provider, North Central Family Medical Clinic ("NCFMC"), for which the United States of America is substituted as Defendant; (2) the hospital at which she received emergency and other treatment, Amisub of SC, Inc., d/b/a Piedmont Medical Center ("Piedmont"); (3) Piedmont emergency department medical providers Jeffrey Warden, MD ("Dr. Warden"), Brian Fleet, PA ("Fleet"), and their employer South Carolina Emergency Physicians, LLC ("SCEP"); (4) her surgeon, Alex Espinal, MD ("Dr. Espinal"), and his employer, Piedmont General Surgery Associates, LLC; and (5) her gastroenterologist, Bret Garretson, MD ("Dr. Garretson"), and his employer, Digestive Disease Associates. *See* ECF No. 88 (Second Amended Complaint).

against all Defendants, though the specifically alleged errors vary between Defendants. *See* ECF No. 88 (Second Amended Complaint).

The matter is before the court on motion of Defendants Dr. Warden and SCEP. ECF No. 121. This motion seeks (1) to exclude the causation testimony of Plaintiff's expert Fred Mushkat, MD ("Dr. Mushkat") as it relates to Dr. Warden's participation in Plaintiff's care, (2) summary judgment in favor of Dr. Warden; and (3) partial summary judgment in favor of SCEP.[2] For reasons set forth below, the motion for exclusion and summary judgment is granted to the extent it relates to care Dr. Warden provided in September 2013 and denied to the extent it relates to care Dr. Warden provided in April 2014.

## FACTS[3]

Plaintiff alleges and the evidence confirms Dr. Warden was involved in Plaintiff's care when she visited Piedmont's emergency department on two occasions: September 16, 2013 ("September Encounter") and April 16, 2013 ("April Encounter"). *See*, *e.g.*, ECF No. 88 ¶¶ 9-14, 32-35; ECF No. 121-2 (September Encounter records); ECF No. 121-8 (April Encounter records). During the September Encounter, Plaintiff presented with symptoms including abdominal pain,

---

[2] SCEP seeks summary judgment through this motion only to the extent Plaintiff's claim relates to Warden's actions. SCEP also joins a separate but similar motion by Fleet relating to Fleet's involvement in Plaintiff's care. *See* ECF No. 122 (Motion by Fleet and SCEP).

[3] The facts are presented in the light most favorable to Plaintiff. *See infra* Discussion § II ("Summary Judgment Standard").

which had continued for two months. ECF No. 121-2 at 2. Plaintiff reported she had seen a gastroenterologist who had performed an upper endoscopy during this period. *Id.*[4]

Dr. Warden ordered various tests, including an ultrasound and, based on the results of the ultrasound, a computed tomography scan ("CT scan") with contrast. ECF No. 121-2 at 9, 10. The radiologist reported the CT scan showed abnormalities "most consistent with Crohn's disease." *Id.* at 11. Dr. Warden's "Progress Notes" characterize the results as "CT with findings concerning for Crohn's disease" and state Plaintiff was discharged "home with GI follow up." *Id.*

There is a dispute of fact whether Dr. Warden advised Plaintiff of the likelihood she suffered from Crohn's disease. ECF No. 121-2 at 16; ECF No. 131-2 at 1 (Dr. Warden dep. at 12); ECF No. 131-8 at 1 (Plaintiff dep. at 178). However, it is undisputed Dr. Warden discharged Plaintiff with written instructions to follow up with Dr. Garretson's practice. ECF No. 88 ¶ 14; ECF No. 121-2 at 16 ("Disposition"); ECF No. 131-1 at 8 ("Discharge Instructions"). It is also undisputed Plaintiff saw Dr. Garretson on September 19, 2013. He performed a colonoscopy on September 25, 2013, and referred her to a surgeon (Dr. Espinal), who performed further tests to rule out acute appendicitis on that same date. ECF No. 88 ¶¶ 14-17; ECF No. 121-3 at 1-3; ECF No. 121-4; ECF No. 121-5.

The Second Amended Complaint alleges Dr. Garretson made a diagnosis of Crohn's disease on or around September 25, 2013, but never communicated that diagnosis to Plaintiff or her primary care provider. ECF No. 88 ¶¶ 16.1-16.4, 21. Plaintiff's summary judgment

---

[4] Plaintiff either disclosed or Dr. Warden otherwise determined Dr. Garretson was Plaintiff's gastroenterologist as Dr. Garretson is listed as her physician on the September Encounter records. ECF No. 121-2 at 1.

3

arguments and attachments suggest a somewhat different position: that Dr. Garretson failed to make a definitive diagnosis of Crohn's disease, though he had all the information necessary to do so. *See*, *e.g.*, ECF No. 131 at 2 (asserting Dr. Garretson was uncertain whether Plaintiff had acute appendicitis or inflammatory bowel disease); ECF No. 131-12 at 7 (Dr. Mushkat dep. at 69, stating Dr. Garretson "apparently [did] not" make a definitive diagnosis of Crohn's following the colonoscopy). Whether or not Dr. Garretson made a diagnosis, Plaintiff alleges and the evidence supports an inference neither Plaintiff nor her primary care provider, NCFMC, were informed of a Crohn's diagnosis. *See*, *e.g.*, Plaintiff dep. 177:23-178:13, ECF No. 133-6 at 8-9 (testifying she first learned she had Crohn's disease at CMC around the time she was ready to come home); ECF No. 123-23 (records reflect Plaintiff was discharged October 28, 2014); ECF No. 121-5 (Dr. Garretson's records including references to phone conversations with Plaintiff's family members shortly after the colonoscopy and surgical consult but not reflecting communication of a diagnosis).[5]

While Dr. Garretson may not have communicated any diagnosis or probable diagnosis to NCFMC, that entity was at least aware Plaintiff had recently undergone various tests including a

---

[5] The present motion addresses only claims against Dr. Warden and SCEP, not claims against Dr. Garretson and his employer. Given the limited scope of the motion, filings regarding Dr. Garretson's actions and communications may be incomplete. The records that are provided suggest a likely dispute of fact whether the failure to "close the loop" with diagnosis and treatment was attributable to Plaintiff's physicians or Plaintiff and her family members (*e.g.*, due to missed appointments). *See* ECF No. 131-10 at 3 (Dr. Jaffe dep. at 20, asserting "Dr. Garretson was not given the opportunity to close the loop"); ECF No. 131-7 at 1 (Dr. Delegge dep. at 22, noting Plaintiff "never came back" for follow up appointment with Dr. Garretson after seeing Dr. Espinal, thus depriving Dr. Garretson of the "opportunity" to start treatment for Crohn's disease); ECF No. 88 ¶ 40 (alleging Dr. Garretson's notes assert Plaintiff was non-compliant, missed appointments, and ignored multiple letters, but characterizing the notes as an attempt to shift the blame because Plaintiff "was never informed of any appointments with Dr. Garretson").

colonoscopy. This is evidenced by records of Plaintiff's September 26, 2013 visit to NCFMC, which indicate her provider at NCFMC was aware Plaintiff had been seen by a specialist and received an endoscopy, colonoscopy, CT scan and ultrasound, but not discussing the results of those tests. *E.g.*, ECF No. 121-6 at 1-3; *but see id.* at 16 (January 23, 2014 notation by same provider stating she "just received medical records from September" reflecting abnormal colonoscopy results and questioning what follow up occurred) . This provider opined Plaintiff's difficulties were likely "urological or gynecological." *Id.*

Plaintiff was subsequently seen at NCFMC in January and March 2014; by Dr. Espinal, the surgeon to whom she was referred by Dr. Garretson, in February 2014; and at a different hospital's emergency department ("Pineville emergency department") in March 2014. *See* ECF No. 121-5 (Dr. Espinal records); ECF No. 121-6 (NCFMC records); ECF No. 121-7 (Pineville emergency department records).[6] During the February visit, Dr. Espinal prescribed a course of prednisone, which Plaintiff agrees is an appropriate treatment for a Crohn's disease flare up. ECF No. 121-5 at 8-11; ECF No. 88 ¶ 26. Dr. Espinal's records indicate he not only advised Plaintiff to return to Dr. Garretson but scheduled an appointment for that purpose. ECF No. 121-5 at 11 (notation of phone message advising Plaintiff of prescription for prednisone and appointment with Dr. Garretson). Plaintiff denies she was informed of the appointment, which she missed. ECF No. 88 ¶ 26. Other than the one course of prednisone prescribed by Dr. Espinal in February 2014,

---

[6] The visit to Dr. Espinal in February 2014 appears to have been prompted by a series of telephone communications between NCFMC and Plaintiff's mother. *See* ECF No. 121-6 at 16, 17 (summary of phone messages and conversations). The first contact was apparently initiated by NCFMC in January 2014 after a provider there reviewed Plaintiff's September 2013 colonoscopy results and, ultimately, led to a request by Plaintiff's mother for a referral to a surgeon to have Plaintiff's appendix removed. *Id.*

Plaintiff denies she received any other treatment for Crohn's disease. *E.g.*, ECF No. 88 ¶¶ 26, 26.1, 37 (characterizing her Crohn's disease as "untreated" but acknowledging Dr. Espinal's prescription of one course of prednisone in February 2014). Viewed in the light most favorable to Plaintiff, the evidence supports this allegation as records from other providers indicate treatment focused on suspected urinary tract or gynecological concerns. *E.g.*, ECF No. 121-6 (NCFMC records); *but see* ECF No. 121-6 at 5 (record of September 25, 2103 visit with Dr. Espinal, indicating he prescribed prednisone on that date, though it is unclear whether the prescription was communicated to Plaintiff or filled).

Plaintiff was seen at the emergency department of Carolinas Medical Center-Pineville on March 14, 2014. ECF No. 121-7 (Carolinas Medical Center records). During this emergency department encounter, a transabdominal pelvic ultrasound was performed with a reported impression of "essentially normal . . . for age." *Id.* at 3. She was treated with pain medications, prescribed antibiotics for a urinary tract infection ("UTI"), and instructed to follow up with a previously scheduled appointment the following Friday. *Id.* at 4 (referring to "OB/GYN" appointment).

Plaintiff was seen at NCFMC on March 21, 2014. ECF No. 121-6 at 19-23. Records indicate she was taking antibiotics for a UTI and had been seen by a surgeon regarding her "chronic problem" (apparently referring to the abdominal complaints). *Id.* at 19. She was scheduled for a pelvic ultrasound. *Id.* at 21, 22 (indicating referral for evaluation and treatment). The ultrasound was performed at Piedmont on April 4, 2014. *Id.* at 23. The "Impression" from that ultrasound states: "Tubular structure adjacent to the right ovary and representing either appendix or fallopian tube. Computed tomography may be confirmatory." *Id.*

Dr. Warden saw Plaintiff for the second time on April 16, 2014, when Plaintiff returned to the Piedmont emergency department by ambulance complaining of abdominal pain that had been ongoing for two years. ECF No. 121-8 at 1. Plaintiff reported lower abdominal pain, nausea, vomiting, watery diarrhea, and "urinating out of her vagina . . . this morning which is new." *Id.* at 2. She advised she was missing an appointment to receive the results of her recent ultrasound at Piedmont. *See id.* at 1 (listing chief complaint as "ongoing abdominal pain x 2 years, seeing Dr. Garretson, missed appointment this morning for Ultrasound results"); ECF No. 131-11 at 10 (Dr. Mushkat report opining Dr. Warden "was obligated to review the ultrasound interpretation from April 4, 2014 at [Piedmont]" and characterizing interpretation as "recommend[ing] considering ordering a CT"). Dr. Warden reviewed records of Plaintiff's September Encounter, ordered blood and urine tests, and performed a vaginal exam. *Id.* Some but not all test results were available for Dr. Warden's review before Plaintiff was discharged later that day. These results included blood work showing an elevated white count and other indications of infection. *Id.* at 9. Apparently based on a preliminary urine test, Dr. Warden diagnosed a UTI and prescribed an antibiotic. *Id.* at 13. While internal emergency department records indicate Plaintiff was instructed to follow up with Dr. Garretson's practice, there is no corresponding record of a written discharge instruction to this effect and it appears to be undisputed Plaintiff did not follow up with Dr. Garretson. *Id.* at 14.[7]

---

[7] Counsel for Plaintiff do not dispute that Dr. Warden at least suggested she return to see Dr. Garretson. *See*, *e.g.*, ECF No. 131 at 3 (stating in memorandum "Dr. Warden also suggested Ms. Knox follow up with Dr. Garretson."); ECF No. 121-9 at 5 (Dr. Mushkat's expert report stating "Dr. Warden referred Ms. Knox back to Digestive Disease Associates.").

The results of two tests, a vaginal wet prep and urine culture, were not available until the following day. Pursuant to the emergency department's procedures, a nurse navigator reviewed these test results and forwarded them for action as she determined appropriate.[8] The nurse navigator forwarded the vaginal test results to physician's assistant Fleet (also an employee of SCEP), who called in a prescription for an antibiotic to address abnormalities noted in the test results. ECF No. 122-3 at 19-24 (Fleet dep. at 19-24). The nurse navigator took no action on the urinalysis culture results, which stated "Multiple organisms present consistent with contamination suggest recollection of specimen." ECF No. 121-8 at 10, 11; ECF No. 122-5 at 7 (Palmetto Fed. R. Civ. P. 30(b)(6) deponent at 7, addressing procedures followed by nurse navigator).[9] Thus, neither Dr. Warden nor Fleet were informed of the apparent contamination and recommendation the patient return for collection of a new urine specimen.

## EXPERT REPORT AND TESTIMONY

Plaintiff identified Dr. Mushkat as one of her medical experts. ECF No. 88, Ex. A (preliminary opinion filed with Second Amended Complaint); ECF No. 121-9 (October 22, 2017 letter to Plaintiff's counsel stating Dr. Mushkat's opinions); ECF No. 152 at 2 (Plaintiff's expert witness disclosure). Dr. Warden asserts and Plaintiff does not contest that Dr. Mushkat is the only expert identified to offer an opinion as to whether Dr. Warden's actions or inactions were negligent or contributed to Plaintiff's injuries. ECF No. 121-1 at 8. Dr. Mushkat's opinions are set out in his October 22, 2017 letter to Plaintiff's counsel, which serves as his Expert Report, and in his

---

[8] There are no allegations or evidence the nurses involved in Plaintiff's care (including the nurse navigator) were employees of SCEP.

[9] ECF Nos. 122-3 and 122-5 were filed in support of Fleet's motion to exclude and for summary judgment.

deposition. *See* ECF No. 121-9 (Dr. Mushkat's Expert Report); ECF No. 121-10 (Dr. Mushkat dep. excerpts filed by Defendant), ECF No. 131-12 (Dr. Mushkat's dep. excerpts filed by Plaintiff).

**Dr. Mushkat's Report.** In his Expert Report, Dr. Mushkat summarizes his opinions as to Dr. Warden's actions as follows:

> Both evaluations that Dr. Warden performed were done at times during which [Plaintiff's] condition required urgent care. On both the September 2013 and April 2014 encounters, he needlessly endangered Ms. Knox by not seeking consultations and/or admission to the hospital. Her urgent condition of untreated Crohn's disease led to a catastrophic series of events a few weeks after the April 16 encounter, resulting in the loss of three limbs and part of the fingers of her one remaining limb. This catastrophic outcome would not have occurred had Dr. Warden followed an accepted standard of care on either encounter. Neglecting her evolving inflammation, infection and fistula development led to overwhelming infection, septic shock, cardiogenic shock and subsequent loss of her extremities.

ECF No. 121-9 at 11.

**September Encounter.** Specifically as to the September Encounter, Dr. Mushkat opines Dr. Warden deviated from the standard of care because he did not properly rule out the possibility of acute appendicitis, which "should have remained the number one possibility on his differential diagnosis list." *Id.* at 7. Dr. Mushkat also opines Dr. Warden deviated from the standard of care by failing to include his belief Plaintiff had Crohn's disease in the written discharge instructions or other written materials to be passed to Dr. Garretson. *Id.* at 8. Dr. Mushkat notes Dr. Warden testified "he did not definitively tell Ms. Knox that she had Crohn's disease . . . [but] believes he would have told [her] that her CT was indicative of Crohn's and [would have explained] what Crohn's disease is." *Id.* at 8 (asserting records should but do not reflect this information was provided to Plaintiff, instead listing diagnosis only of "abdominal pain").

**April Encounter.** As to the April Encounter, Dr. Mushkat opines Dr. Warden deviated from the standard of care in a number of ways, including by "failing to obtain an accurate medical

9

history" regarding Plaintiff's Crohn's disease. *Id.* at 8. Dr. Mushkat notes Dr. Warden believed Plaintiff had Crohn's disease in September (and referred to that visit in his April Encounter notes). *Id.* Despite that belief and Plaintiff's presentation with symptoms that could be related to Crohn's disease, Dr. Warden failed to inquire whether Plaintiff had received a diagnosis or related treatment for Crohn's disease. *Id.* As noted above, Plaintiff denies any medical provider advised her of a Crohn's diagnosis until well after her surgery. *See supra* p. 4.

Dr. Mushkat also opines Dr. Warden fell below the standard of care in his evaluation of whether Plaintiff had a fistula. ECF No. 121-9 at 8, 9 (questioning the sufficiency of the vaginal exam that was done and opining Dr. Warden did not do enough to determine whether Plaintiff had a vesicovaginal fistula before discharging her). Relying on potential causes and differential diagnosis, Dr. Warden concludes "infection [was] the only reasonable explanation" for Plaintiff's reported symptoms and test results. *Id.* at 9. Referring to Plaintiff's report of a new symptom of urinating through her vagina, Dr. Mushkat opines "Dr. Warden had [and failed to meet] an urgent duty to look for a cause for this unusual complaint in a patient of [Plaintiff's] age." *Id.* at 10. Dr. Mushkat asserts "[u]ntreated Crohn's disease with subsequent inflammation is a well-known cause of fistula development and bowel perforation." *Id.* Thus, Dr. Warden's prior suspicion Plaintiff suffered from Crohn's disease, together with the report of symptoms consistent with a fistula, should have led him to investigate further. *Id.*

Dr. Mushkat also opines Dr. Warden fell below the standard of care in failing to (1) review Plaintiff's April 4, 2014 ultrasound results, which were available to him and were similar to the results from the ultrasound performed during the September Encounter that led to the referral to Dr. Garretson and (2) pursue a CT scan as suggested by the most recent ultrasound results. *Id.* (noting "April ultrasound interpretation . . . recommended considering ordering a CT" and opining

review of these results "should have led [Dr. Warden] to order a contrast CT and a subsequent surgical consultation"); *see also* ECF No. 121-6 at 23 (April 4, 2014 ultrasound report stating "Computed tomography may be confirmatory"). Dr. Mushkat opines performing the recommended CT and other follow up would have led Dr. Warden to discover Plaintiff had never received a Crohn's diagnosis or treatment. ECF No. 121-9 at 11.

Dr. Mushkat lists six alternatives Dr. Warden properly could have pursued during the April Encounter. These include ordering further tests, consulting a urologist or surgeon, or "call[ing] Dr. Garretson to ask about admitting Plaintiff for further evaluation." *Id.* at 10, 11. Dr. Mushkat opines Dr. Warden erred "by not seeking consultations and/or admission to the hospital." *Id.* at 11. Dr. Mushkat sums up his opinion as to Dr. Warden's April Encounter care as follows:

> Under no circumstances was it acceptable for Dr. Warden to discharge Ms. Knox while her workup for infection resulting in fistula was incomplete. If Dr. Warden believed that Ms. Knox had Crohn's disease, as he stated he did, given her return to the [emergency department] with abdominal pain, a highly elevated white count with left shift and evidence of a fistula, then it was incumbent upon Dr. Warden to rule out a problem with the untreated Crohn's. This would have mandated a contrast CT and surgical consultation. The presentation of abdominal pain and no diagnosis from any outside provider for this reportedly chronic abdominal pain required surgical consult before discharge. None of these options [was] done.

*Id.* at 11 (also stating "suspicion of fistula in a patient with untreated Crohn's disease is ominous, especially if the presentation includes signs of infection" and characterizing Dr. Warden's treatment in the face of complaints suggestive of a fistula as evidencing a "cavalier attitude towards a potentially life-threatening infection causing a fistula.").

Dr. Mushkat acknowledges Dr. Warden referred Plaintiff to Dr. Garretson's practice for follow up. *Id.* He, nonetheless, opines the "discharge instructions were at best unclear." *Id.* at 11 (noting Dr. Warden testified he told Plaintiff to follow up with both Dr. Garretson and her primary

11

care provider but opining "[b]oth of these recommendations should have been written into the discharge instructions.").

## DISCUSSION

Dr. Warden and SCEP seek to exclude Dr. Mushkat's causation testimony as to both the September and April Encounters. They also seek summary judgment based on the absence of evidence of causation. These two aspects of the motion are addressed separately below.

**I.      Exclusion of Dr. Mushkat's Causation Testimony**

**Standard for Exclusion of Expert Testimony.** As recently summarized in *Plaintiffs Appealing CMO 100 v. Pfizer, Inc.*, ___ F.3d __, No. 17-1140 (4th Cir. June 12, 2018):

> In assessing the admissibility of expert testimony, a district court assumes a "gatekeeping role" to ensure that the "testimony both rests on a reliable foundation and is relevant to the task at hand." [*Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 597 (1993)]. The district court's inquiry is a "flexible one," whose focus "must be solely on principles and methodology, not on the conclusions that they generate." *Id*. at 594–95. *Daubert*'s design is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

Slip. Op. at 10.

**Defendants' Arguments.** Dr. Warden and SCEP argue Dr. Mushkat's causation testimony relating to Dr. Warden's actions should be excluded because it "relies upon a series of attenuated assumptions, thus rendering his opinion unreliable as a matter of law." ECF No. 121-1 at 10.

As to the September Encounter, Dr. Warden and SCEP note Plaintiff was seen by a gastroenterologist and surgeon within two weeks after discharge and received the very tests Dr.

Mushkat believes she would have received had she been admitted to the hospital for further testing. ECF No. 121-1 at 11, 12. Given this testing, they argue Dr. Mushkat's opinion as to a different outcome (if the same tests were performed two weeks earlier in a different setting) is purely speculative. *Id.* at 12 (also arguing Dr. Mushkat's opinion as to the September Encounter rests on multiple unsupported assumptions including that Plaintiff would have been admitted for testing).

As to the April Encounter, Dr. Warden and SCEP focus on Dr. Mushkat's concession "he is not qualified to state what another specialist would have done or what a particular test would have demonstrated" had Dr. Warden sought to have Plaintiff admitted or ordered a new CT scan, two of the alternatives Dr. Mushkat opined would have been appropriate. *Id.* at 12 (noting Dr. Mushkat conceded this aspect of his opinion was based on having followed other patients "casually" following emergency department encounters).

Dr. Warden and SCEP characterize Dr. Mushkat's opinion as nothing more than *ipse dixit*. They argue his causation opinion fails to satisfy Federal Rule of Evidence 702's standards for admission of expert testimony because it connotes nothing "more than subjective belief or unsupported speculation." ECF No. 121-1 at 10, 11 (quoting *Daubert,* 509 U.S. at 589-90 in arguing "an opinion that a different outcome **might** have occurred does not 'connote[] more than subjective belief or unsupported speculation.'" (emphasis in original)).

**Plaintiff's Arguments.** In her consolidated response to separate motions filed by Fleet and Dr. Warden (both of which are joined by SCEP), Plaintiff relies on Dr. Mushkat's deposition testimony in arguing Plaintiff's clinical presentation and test results during the September Encounter demonstrated a "severe response to an inflammatory process" and should have led to admission. ECF No. 131 at 4, 5 (citing Dr. Mushkat dep. at 56, 67-69, 89). Plaintiff characterizes Dr. Mushkat's testimony as stating if Dr. Warden had pursued admission in September, "a

13

reasonably prudent gastroenterologist would have conducted a colonoscopy and biopsy, diagnosed the evident Crohn's disease, and initiated a treatment plan" that would have avoided Plaintiff's subsequent adverse outcome. ECF No. 131 at 5 (citing Dr. Mushkat dep. at 68, 69).

As to the April Encounter, Plaintiff relies on Dr. Mushkat's testimony Plaintiff's "lab results were just as worrisome" in April as in September, with the additional report of urination through her vagina. ECF No. 131 at 5 (citing Dr. Mushkat dep. at 89). She notes Dr. Mushkat opined the newly reported symptom should have "set off all kinds of alarms" and Dr. Warden "should have concluded Ms. Knox had a fistula." *Id.* (citing Dr. Mushkat dep. at 84, 86). Plaintiff also points to Dr. Mushkat's testimony that, had Dr. Warden sought admission, a CT scan with contrast likely would have been ordered to determine which specialty should be involved, and this scan would have led to diagnosis and treatment of Plaintiff's Crohn's disease. *Id.*

Referring to both encounters, Plaintiff asserts "Dr. Mushkat's causation testimony is supported by a number of other witnesses . . . who agree a colonoscopy interpretation by a reasonably prudent doctor after either emergency room visit would have led to diagnosis and treatment." *Id.* at 11. She also notes "Dr. Mushkat testified an admission for suspected Crohn's disease likely would lead to a colonoscopy." *Id.* at 12.

**Discussion.** In presenting their arguments for and against exclusion of Dr. Mushkat's causation testimony, the parties tend to blend their discussion of the September and April Encounters, arguing for the same result as to both encounters. For reasons explained below, the court finds the two encounters must be considered separately and, ultimately, concludes Dr. Mushkat's causation opinion is not admissible as to the September Encounter but is admissible as to the April Encounter.

14

**September 16, 2013.**  Dr. Mushkat's Expert Report focuses on two concerns with Dr. Warden's care during the September Encounter:  (1) his alleged failure to rule out an appendicitis prior to discharge  (ECF No. 121-9 at 7); and (2) his alleged failure to give Plaintiff more detailed written discharge instructions to pass on to Dr. Garretson (*id.* at 8).  In his deposition, Dr. Mushkat characterized the first as his "major objection" to the care provided, but conceded he was not claiming Plaintiff had or suffered any injury from acute appendicitis.  ECF No. 121-10 at 5-6 (Dr. Mushkat dep. at 67, 68).  He, instead, maintained that, had Plaintiff been admitted to eliminate a diagnosis of acute appendicitis, testing for that diagnosis would have resulted in a diagnosis of Crohn's disease and treatment for that condition.  *Id.* at 6 (Dr. Mushkat dep. at 68).  Dr. Mushkat conceded Plaintiff obtained the same tests he believes should have been performed in the hospital within a short time after the September Encounter.  *Id.* at 7-10 (Dr. Mushkat dep. at 69-72); *id.* at 11 (Dr. Mushkat dep. at 73) (clarifying his opinion is Dr. Warden should have sought Plaintiff's admission, though he could not say whether a gastroenterologist would have admitted Plaintiff on September 26, 2013, had Dr. Warden pursued that course).

Dr. Mushkat also conceded the second concern noted in his Expert Report, the alleged failure to provide more detailed written discharge instructions for Plaintiff to share with Dr. Garretson, "did not change the outcome."  *Id.* at 11 (Dr. Mushkat dep. at 73).  This was because Dr. Garretson was able to and did access records from the September Encounter.

In sum, through his deposition, Dr. Mushkat essentially conceded the two primary errors raised in his Expert Report regarding the September Encounter (possible undiagnosed acute appendicitis and failure to provide Dr. Garretson complete information about that encounter) did not cause Plaintiff's injuries (because she did not suffer injury from appendicitis and Dr. Garretson obtained all the information necessary to make a diagnosis).  While he recast the first concern as

15

supporting the need for admission, he offered no explanation why outpatient testing would be less reliable than inpatient testing or, more critically, why any distinction between inpatient and outpatient testing or related delay was causative of Plaintiff's injuries. At best, Dr. Mushkat appears to rely on a belief Plaintiff might have received an earlier diagnosis and treatment had she been evaluated by a different gastroenterologist who might have followed a different course than Dr. Garretson. Such an opinion is merely speculative and not based on application of scientific principle or process.

While neither Dr. Mushkat nor Plaintiff concede the point, the central premise of Dr. Mushkat's recast opinion appears to be *a different gastroenterologist* would have performed and reviewed the same tests if Plaintiff had been admitted and tested on an inpatient basis and this gastroenterologist would not have made the same mistakes Dr. Garretson is alleged to have made. Beyond the speculative assumptions a gastroenterologist would have admitted Plaintiff and Dr. Garretson would not have performed whatever testing was done, this theory fails because it rests, in essence, on an assumption the *error* was in referring Plaintiff to Dr. Garretson rather than some other physician. Neither Dr. Mushkat nor any other expert has opined Dr. Warden deviated from the standard of care by referring Plaintiff to Dr. Garretson, the gastroenterologist Plaintiff had already seen and who had recently performed an endoscopy on her.

The court, therefore, excludes Dr. Mushkat's causation opinion relating to the September Encounter because it is speculative. Dr. Warden and SCEP's motion is granted as to this aspect of their motion.

**April 16, 2014.** The court reaches a different result as to Plaintiff's April Encounter. Dr. Mushkat's opinion as to this encounter relies on a variety of reported symptoms and objective tests supporting the conclusion Plaintiff was suffering from a significant infection at the time of the

16

April Encounter. While Plaintiff's reported symptoms and test results might not all have resulted from her Crohn's disease, Dr. Mushkat opined a number were consistent with an exacerbation of or complications from that disease.

Dr. Warden not only had access to but in fact reviewed records from the September Encounter when Plaintiff returned to the emergency department in April 2014. Thus, he was aware, or at least on notice, of a likelihood Plaintiff had Crohn's disease. While his opinions are not so limited, Dr. Mushkat opined the standard of care, given Plaintiff's history and complaints, required Dr. Warden to do the following: (1) inquire further to ensure a Crohn's disease diagnosis had either been ruled out or Plaintiff was receiving treatment for that condition (*see* ECF No. 121-9 at 10 stating opinion proper inquiry would have revealed Plaintiff "was never informed of her diagnosis of Crohn's and had not received treatment for it"); (2) review the April 4, 2014 Piedmont ultrasound results and recommendation; and (3) at least call Dr. Garretson to ask about admitting her for further evaluation. Dr. Mushkat opines Dr. Warden did not do any of these, instead treating Plaintiff only for a UTI, leaving certain tests open, and giving less than clear instructions to follow up with her primary care provider and Dr. Garretson. Unlike the September Encounter, there is no record of written discharge instructions alerting Plaintiff to the need to see Dr. Garretson. Neither does it appear she, in fact, saw Dr. Garretson within a short period after the September Encounter. Instead, within a few weeks she presented with serious complications from her Crohn's disease including an intestinal blockage, multiple fistulae, and resulting sepsis.

Under these circumstances, the court finds Dr. Mushkat's causation opinion admissible, at least as it relates to Dr. Warden's alleged failure to inquire further, or at least call Dr. Garretson, which likely would have led him to discover Plaintiff had not been informed of her Crohn's diagnosis (or had that condition ruled out) and was not receiving treatment for that condition.

There is enough to support the premise Dr. Warden was, at that point, obligated to take *some* further action to close this gap in Plaintiff's care. This, in turn, likely would have avoided further deterioration leading to her ultimate injuries. Thus, Dr. Mushkat's opinions are sufficient to support a finding of causation between one or more alleged negligent acts (failure to inquire further of Plaintiff, her family, or Dr. Garretson and failure to provide clear instructions for follow up with Dr. Garretson) and Plaintiff's subsequent injuries, particularly given the close temporal connection between the April Encounter and Plaintiff's May 4, 2014 hospitalization for complications resulting from her Crohn's disease.

## II. Summary Judgment

**Summary Judgment Standard.** Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987). The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

**Discussion.** Dr. Warden argues he is entitled to summary judgment due to insufficient evidence of causation, even if Dr. Mushkat's causation testimony is allowed. Though not identical, these arguments overlap with the arguments for exclusion.

**September Encounter.** For reasons explained in the preceding section, Dr. Mushkat's causation testimony is excluded as it relates to Dr. Warden's actions or inactions during the

18

September Encounter. This leaves Plaintiff with no evidence to support a necessary element of her claim against Dr. Warden (or SCEP to the extent liable as his employer) relative to the September Encounter. The court, therefore, grants Dr. Warden and SCEP summary judgment as to this aspect of Plaintiff's claim.

**April Encounter.** For reasons explained above, Dr. Mushkat's causation testimony survives the present challenge as to the April Encounter. The court finds this testimony sufficient to preclude summary judgment as to this aspect of Plaintiff's claim. The court, therefore, denies summary judgment to the extent it relates to the April Encounter.

## CONCLUSION

For the reasons set forth above, Dr. Warden and SCEP's motion (ECF No. 121) is granted to the extent it seeks to exclude Dr. Mushkat's causation testimony and summary judgment relating to the September Encounter with Dr. Warden. The motion is denied to the extent it seeks to exclude Dr. Mushkat's causation testimony and summary judgment relating to the April Encounter.

IT IS SO ORDERED.

s/Cameron McGowan Currie
CAMERON McGOWAN CURRIE
SENIOR UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
June 29, 2018